DAVID W. OLIVER et al.

v.

THE NEW YORK BAY CEMETERY COMPANY.

Defendants, thirty years ago, changed the course of a natural stream of water that ran through defendants' land and drained complainants' lands, and substituted therefor a sewer, presumably by consent of the owner of complainants' lands.  They have obstructed the sewer and recently built an embankment near the complainants' line so as to back the water on complainants' said lands. —*Held*, that this court would compel them to remove the embankment, and either to restore the natural stream to its original course or to remove the obstructions from the sewer and rebuild it, although there is an allegation that if either be done the water will be discharged on the lands of other persons, and also that the defendants are pecuniarily unable to do either.

Bill for relief.   On final hearing on pleadings and proofs.

*Mr. L. Abbett,* for complainants.

*Mr. W. A. Lewis,* for defendant.

THE CHANCELLOR.

This suit is brought by David W. Oliver and others, owners of land within the corporate limits of Jersey City, adjoining lands of the New York Bay Cemetery Company, lying within the same municipal bounds, to obtain the benefit of an ancient water-course (or a substitute therefor) which the complainants allege ran immemorially, up to the time of the stoppage thereof by the defendants, over the land of the latter, and thus drained the complainants' land of the surface and other water which fell and gathered thereon.   The injury complained of is the stopping up, in the first place, by the defendant, of a sewer which it many years ago built and substituted for the water-course; and the building, in the next place, of an embankment in 1881 across what once was the bed of the stream, whereby the flow of the

water over the defendant's land was almost entirely stopped and the water backed up on the complainants' property. The bill states that from time immemorial the premises of the parties have been traversed by a brook running, in a well-defined course, from north to south to and finally terminating at and in the Morris canal; that the brook served as a drain for the surface and other water which collected on the complainants' premises; that until the committing by the defendants of the acts complained of, the lands of the complainants fully enjoyed the privilege of such drainage by the brook, whose channel was their only means of such drainage; that more than twenty years ago the defendant, for the purpose of relieving its land from the burthen of the waters of the brook, and so improving the condition of its property (but thus preventing the flow of the water off the land now owned by the complainants), closed the brook and substituted in its place a drain beginning at a point in the brook, on the land now owned by the complainants and adjacent to the line between that property and the land of the defendant; that the drain was from that point constructed and carried westerly, then southerly and then again southerly, in a straight line, to the Morris canal; that thereafter the drain was the only means of carrying off the water from the land owned by the complainants, and was barely sufficient for that purpose; that in 1875 the defendant, without leave or license, permitted the drain to be filled up with earth and other materials at a place near the complainants' southwesterly boundary line, thus impeding the drainage; that the complainant David W. Oliver then notified the defendant of the existence of the obstruction, and called upon it to provide some way for the flow of the surface-water, and threatened suit for damages in case of noncompliance with the requirements of the notice; that the defendant then removed the obstruction, but again in 1879 filled up the drain in like manner, and Mr. Oliver gave it another notice similar to that given in 1875, and the defendant removed the obstruction; and that in 1881 the defendant again in like manner filled up the drain, and also without leave made an embankment of earth and stone and other materials across what once

was the bed of the brook at the line between the land of the defendant and that of the complainants, and completely obstructed the flow of the water and caused it to back up on the complainants' land, to their great damage. The bill prays an injunction restraining the defendant from constructing or maintaining any embankment or any other structure on its lands whereby the surface or other water on the complainants' premises may be prevented from passing off through the brook or the drain, and from permitting the drain to be filled up, and from doing anything else whereby the flow of the surface or other water from the complainants' property, as it used to flow before any obstruction was created to the free passage of the water, will be prevented or hindered; and it also prays a decree that the ancient channel of the brook, or a good and sufficient drain, be restored and kept in good and perfect condition by the defendant, so that the complainants' premises may be kept free from the water which is now backed up upon them.

The answer denies all the material statements of the bill, and alleges that the grading of Ocean avenue at or near the locality of the alleged water-course on the complainants' land, brings an unusually large quantity of water there, part of which is collected in a ditch on the complainants' land near the boundary line between their land and the defendant's property, and that when the ditch overflows the defendant's premises are injured. It alleges, also, that the defendant is without means to pay the expense of constructing a drain if the court should order it to do so.

A very careful perusal of the voluminous testimony in this cause convinces me that the claim made in the bill, of the existence of a natural water-course running in the lands now of the parties to this suit, is well founded. The proof establishes the fact. To say nothing of the other evidence, George Vreeland, who is sixty years old, and has lived within about half a mile of the place all his life, testifies that there was a creek beginning at the corner of his father's woods, which corner he locates at the place where the brook in question is alleged by the complainants to have begun, and from thence running in a (generally) southerly direction, crossing what is now known as Garfield avenue, near

the corner of that avenue and Chapel avenue (on the defendant's property), and emptying into New York bay at a place called Straatmaker's creek.   He also testifies that the embankment complained of in the bill is on the line of that water-course, and that he thinks the brook ran through the defendant's land quite a while after the defendant bought it.   Michael De Motte Vreeland, who is also sixty years old, and has known the property all his life, testifies to the existence of the brook, and says that after the defendant got its property it filled up the brook.   Some of the witnesses appear to be of opinion that the water-course is what was anciently called Straatmaker's creek, but the evidence on that subject is not at all satisfactory.   The matter, however, is wholly immaterial.   What the name of the water-course was, or whether it was known by any name or not, is obviously a matter of no consequence.   And it is of no importance to know whether the water-course was what was known as Straatmaker's creek, except as it might perhaps more thoroughly establish its character, and might aid in fixing the place where it emptied; but whether it would do either is doubtful, for the location of that creek is, to say the least of it, difficult; and for want of any definite information on the subject of the extent of the creek, and in the changes which have taken place in the surface of the ground in that neighborhood, which has now become urban property, it is impossible to say how far inland that creek extended. It is enough to know that there was a natural water-course running from a point in the complainants' land across it, and then through the land of the defendant, and that its privileges have not been absolutely abandoned or extinguished, but that the defendant (which acquired its property about thirty years ago) substituted for it, in its own ground, a sewer.   The sewer appears to have been of stone, and one of the mouths of it was on the land now of the complainants and was guarded by an iron grate to keep out leaves and other substances.   The sewer was built over thirty years ago.   It began, as before stated, on the land now of the complainants and came down Chapel avenue to the corner of that avenue and Garfield avenue, and then crossed the former to the southwesterly corner of the latter.   Its course is established

Oliver v. New York Bay Cemetery Co.

and can be readily designated. The defendant's employees filled it up, a year or two before this suit was begun, at a point in Chapel avenue not very far distant from the corner of that avenue and Garfield avenue. Subsequently the top of the man-hole at Cypress avenue, in Chapel avenue, was taken off and the man-hole filled up, and after that the embankment complained of in the bill was created. The effect of the embankment was, after the filling up of the sewer, to prevent the water from flowing over the defendant's land and to back it on that of the complainants. A great deal of testimony has been taken on the part of the defendant to show that the improvement of Ocean avenue has increased (by the grading and paving of that avenue) the amount of water at the point where that part of the complainants' land which is overflowed is situated; but it is not clearly proved that such is the fact. Whether it be so or not, however, is not a matter of importance in the view I take on this head. It appears that the water-course, as it existed, would have discharged all the water that now collects, and that the sewer which the defendant substituted for it would also have done so. And it is just that the defendant should be required to restore and renew the provision for the discharge of the water, which it itself substituted by (as may be presumed) the agreement of the parties, for the water-course. The opinion of experts acquainted with the ground is that a circular sewer of eighteen inches in diameter, or a sewer of sixteen inches square, would discharge all the water. Mr. Harrison (civil engineer) testifies that from what he could see of the drain which the defendant had substituted for the water-course, it was of the latter dimensions (sixteen inches square), and from the other testimony on the subject this appears to have been about the size of it. The water was freely discharged through it up to about ten years ago.

The evidence shows complaints, on the part of the complainants, through David W. Oliver, before bringing suit, and that they proved ineffectual. Indeed, on one occasion, when he remonstrated with the trustees of the defendant on the subject, they denied that the defendant was responsible for the backing of the water, but at the same time, and in the same interview,

8

one of them told him they were " only sorry they could not flow him worse."

The defendant says that if it be required either to open the water-course or to construct the sewer, it will thus provide a way for discharging the water off the complainants' premises upon the land of other persons. But the proof is that in the spring of 1867 the water was discharged from the sewer into Garfield avenue, south of Chapel avenue, and it appears that there was and is a natural course for water along the westerly side of Garfield avenue to a point therein about five hundred feet from the south side of Chapel avenue, where it runs into and along a ravine, whence it is carried through two iron pipes, one of eighteen and the other of thirty inches, under the railroad of the Central Railroad Company, and thence is discharged into the Morris canal. The canal being between the upland and the bay, intercepts the streams in their course to the latter. It does not appear that these means will not be as available now for the discharge of the water from the sewer as they seem to have been formerly, up to the time when the defendant shut up the sewer.

The defendant also insists that no decree should be made against it, either to open the water-course or build the sewer, if for no other reason because, as it alleges, it has no means to defray the expense of either. But it is highly probable, to say the least of it, that in fact it has the means to do either, without any difficulty whatever, from its ordinary sources of income, which, it may be observed, appear to have been sufficient not only to pay from time to time the cost of this protracted and expensive litigation to resist the complainants' claim to relief, but to leave a surplus. It will be quite time enough, however, to consider whether the defendant ought to be excused, on the ground of want of ability, from obeying the decree of this court, when it presents that excuse for non-performance. This court will undoubtedly be able to find means to secure justice to the complainants in the premises.

There will be a decree that the defendant forthwith remove the embankment, and do, within thirty days from the time of filing the decree, rebuild the sewer, at its own expense, in the

same place in which it was originally built, and of the dimensions of at least sixteen inches square, or if round, of at least eighteen inches in diameter; and that in default thereof, it open the water-course (of such dimensions as this court may fix, if the parties cannot agree), over its land, in the same place, or such other one as this court, on application by the defendant, may designate instead thereof; and that if it construct the sewer, it perpetually maintain it in good condition at its own expense. The defendant will be decreed to pay the costs of this suit.